**STATE of Tennessee**

v.

**Farris Genner MORRIS, Jr.**

Supreme Court of Tennessee,
at Jackson.

July 10, 2000.

George Morton Googe, District Public Defender, Jackson, Tennessee, (On Appeal and At Trial), and Daniel J. Taylor, Assistant Public Defender, and Jesse H. Ford, III, Jackson, Tennessee, (At Trial), for the appellant, Farris Genner Morris, Jr.

Paul G. Summers, Attorney General & Reporter and Michael E. Moore, Solicitor General and Elizabeth T. Ryan, Assistant

Attorney General, Nashville, Tennessee (On Appeal), and James G. (Jerry) Woodall, District Attorney General, and Al Earls, Assistant District Attorney General, Jackson, Tennessee (At Trial), for the appellee, State of Tennessee.

## OPINION

ANDERSON, C. J., delivered the opinion of the court, in which BIRCH, HOLDER and BARKER, J.J., joined.

A jury convicted the defendant of two counts of premeditated first degree murder and one count of aggravated rape. The jury imposed the death penalty for one of the first degree murders after finding that evidence of two aggravating circumstances—that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and that the murder was committed in the course of a first degree murder, rape, burglary or kidnapping—outweighed mitigating evidence beyond a reasonable doubt. The jury imposed life without parole for the other first degree murder after finding that evidence of two aggravating circumstances—that the defendant knowingly created a risk of death to two or more persons other the victim murdered during the act of murder and that the murder was committed in the course of a first degree murder, rape, burglary or kidnapping—did not outweigh mitigating evidence beyond a reasonable doubt. The trial court imposed a 25–year sentence for aggravated rape to run consecutively to the sentence of life without parole. The Court of Criminal Appeals affirmed the convictions and the sentences. We hold that the evidence was sufficient to support the convictions, that the defendant is not entitled to relief based on the constitutionality of death by electro-

cution, and that the evidence was sufficient to support the jury's determination that evidence of two aggravating circumstances outweighed mitigating evidence beyond a reasonable doubt. We also hold that the death sentence is not arbitrary, excessive or disproportionate as applied in this case.

The defendant, Farris Genner Morris, Jr., was convicted of two counts of premeditated first degree murder and one count of aggravated rape. The jury imposed the death penalty for the premeditated first degree murder of Erica Hurd after finding that evidence of two aggravating circumstances, i.e., the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and the murder was committed in the course of any first degree murder, rape, burglary or kidnapping,[1] outweighed evidence of mitigating circumstances beyond a reasonable doubt. The jury imposed life without parole for the premeditated first degree murder of Charles Ragland after finding that evidence of two aggravating circumstances, i.e., the defendant knowingly created a risk of death to two or more persons other than the victim during the act of murder and the murder was committed in the course of any first degree murder, rape, burglary or kidnapping,[2] did not outweigh evidence of mitigating circumstances beyond a reasonable doubt. The trial court imposed a 25–year sentence for the aggravated rape of Angela Ragland, to be served consecutively to the sentence of life without parole.

After the Court of Criminal Appeals affirmed the convictions and the sentences imposed, the case was docketed in this Court for automatic review.[3] We reviewed the Court of Criminal Appeals' decision, the record, and the applicable law, and

---

1. Tenn.Code Ann. § 39–13–204(i)(5) and (7)(1991 and Supp.1994).

2. Tenn.Code Ann. § 39–13–204(i)(3) and (7)(1991 and Supp.1994).

3. Tenn.Code Ann. § 39–13–206(a)(1)(1997)("The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court.").

entered an order specifying the following issues for argument: whether the evidence was sufficient to support the convictions for premeditated first degree murder; whether electrocution constitutes cruel and unusual punishment; whether the evidence was sufficient to support the aggravating circumstances and the jury's finding that the evidence of the aggravating circumstances outweighed the mitigating evidence beyond a reasonable doubt with regard to the first degree murder of Erica Hurd; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

We conclude that the evidence was sufficient to support the verdicts of premeditated first degree murder and that the defendant is not entitled to relief on the issue of whether electrocution is cruel and unusual punishment. We further conclude that the evidence was sufficient to support the two aggravating circumstances with regard to the murder of Erica Hurd, as well as the jury's finding that the evidence of these aggravating circumstances outweighed mitigating evidence beyond a reasonable doubt. Finally, we hold that the sentence of death is not arbitrary, excessive or disproportionate to the sentence imposed in cases involving similar crimes and defendants. Therefore, we affirm the Court of Criminal Appeals' judgment.

## BACKGROUND

### Guilt Phase

Charles and Angela Ragland lived in a duplex residence in Jackson, Tennessee. The defendant, Farris Genner Morris, lived with his wife in the adjoining residence.

In the early morning hours of September 17, 1994, Angela Ragland arrived at her home along with her 15–year–old cousin, Erica Hurd. Charles Ragland was awake in the bedroom with the light on. Shortly after arriving, Erica went outside to retrieve something from the car. When Erica came back into the house, Angela heard a scream and saw that Morris was holding a shotgun to Erica's head.

Morris pushed Erica onto the bed in the Raglands' bedroom and asked Charles "where the dope was." Charles Ragland replied that he "didn't have any" and asked Morris if he wanted money.[4] After Morris responded that he would "find it himself," Morris fired a shot into the floor and ordered Charles Ragland to get on the floor. He placed a pillow on Ragland's head and shot him one time in the head.

Morris ordered Erica to get into a closet by threatening to "blow her head off." He forced Angela into another bedroom, tied her wrists and ankles, and covered the window with a mattress so that "nobody could see if they walked by." Morris then retrieved Erica from the closet. Angela Ragland testified that she heard Erica pleading for Morris not to kill her and that she heard Morris say "shut up." She testified that she heard Erica screaming and gasping for breath, and then silence.

Morris returned to the bedroom and, still holding the shotgun, forced Angela Ragland to bathe him. Afterward he ordered Angela to put on a negligee and make him something to eat, which she did. Morris then forced Angela to have sexual intercourse with him "three or four times" and to perform oral sex upon him. Morris told her that he had once been "accused of raping someone and . . . if he was going to jail, he was going to go to jail for doing something." He told Angela that "society made him the way he was" and "was the reason that he was doing what he did."

Around 6:30 a.m., Morris heard his wife in the adjoining residence and told Angela that he would let her go. He instructed her to tell police that she found the bodies of her husband and cousin when she arrived home that morning. Morris used a cloth to wipe off objects he had touched and he warned Angela not to go to the

---

**4.** Angela Ragland testified that her husband did not sell or use drugs.

police. Angela fled to the house of a nearby friend, who drove her to the police station. The police found Morris at his home shortly thereafter and arrested him.

The bodies of Charles Ragland and Erica Hurd were later discovered in the Ragland residence. Charles Ragland had been shot in the head. Erica Hurd had been beaten and stabbed repeatedly. A blood-stained steak knife was found behind a couch and a large butcher knife with traces of blood was found in a chair in the living room. Angela Ragland testified that neither knife belonged to her or her husband. A 12–gauge pistol grip, pump action shotgun was later found underneath Morris's dresser drawer.

After being advised of and waiving his constitutional rights, Morris gave a statement to Officers Patrick Willis and James Golden of the Jackson Police Department.[5] Morris said that on the day of the offense he had purchased and smoked $250 worth of cocaine. He admitted that he had an exchange with Charles Ragland at 1:00 a.m., just a few hours prior to the murders, in which he asked Ragland to sell him drugs and, when Ragland declined, told Ragland that "he was going to regret disrespecting me." Morris admitted that he went to his house, got his shotgun, loaded two shells into the shotgun, and waited for Ragland's wife, Angela, to get home. Morris admitted that he entered the Ragland's residence with the shotgun and demanded that Charles Ragland sell him drugs. He admitted that after Ragland said he didn't have any drugs, he fired a shot into the floor, put a pillow over the barrel of the gun and shot him in the head. Morris admitted that he put Erica Hurd in a closet and tied up Angela Ragland. Morris told officers that he intended only to tie up Erica Hurd but that he stabbed her because she acted crazy and they struggled over a knife. Morris admitted he had sexual intercourse and oral sex with Angela Ragland.

Dr. O.C. Smith, the Deputy Chief Medical Examiner for West Tennessee, testified that Charles Ragland died from a shotgun wound to the head. Dr. Smith testified that he found evidence of an "intermediate target" between the weapon and Ragland's head, but that Ragland's death was "instantaneous because the brain [was] destroyed."

Dr. Smith testified that Erica Hurd had died as a result of multiple injuries including, stab wounds, blunt trauma to the head, skull fractures, and damage to the brain. Dr. Smith found that there were 37 stab wounds, 23 of which were sustained prior to death and 14 of which were post-mortem. Dr. Smith testified that 25 of the stab wounds were to the victim's neck and face and that the force of the stabbings was great enough to cause the knife blades to bend upon striking bone.

The defense theory focused on Morris's use of crack cocaine. In addition to Morris's own statement to police, Russell Morris, the defendant's brother, testified that he saw the defendant smoking crack around 5:15 p.m. on the evening before the murders.

Dr. Robert Parker, a doctor of pharmacology at the University of Tennessee, testified about the effects of crack cocaine use. Parker testified that smoking crack cocaine produces an intense euphoria and symptoms such as excitability, paranoia, mania, and impaired judgment. Parker testified that most users of crack cocaine go on a "cocaine run" or "binge." When users become unable to duplicate the feeling of euphoria from the initial uses of the drug, judgment is further impaired and there is "an increased risk of violent or homicidal behavior." Parker explained that an acute withdrawal or "crash phase" occurs when the drug is not used. It can be marked by depression, exhaustion, paranoia, anxiety, and suicidal thoughts. Parker testified that the evidence of Mor-

---

5. The statement in its entirety is contained in the opinion of the Court of Criminal Appeals, which is attached to this opinion as an appendix.

ris's behavior was "consistent with the ingestion of cocaine."

Dr. William Bernet, medical director of the Psychiatric Hospital at Vanderbilt University, testified that he evaluated Morris based on an interview and a review of various records and documents. Dr. Bernet concluded that due to false accusations of rape prior to these offenses, Morris became suicidal and a crack cocaine user. Dr. Bernet stated that the mental stress and use of crack cocaine "affected [Morris's] judgment" and "may have prevented him from forming the intent" to commit the murders of Charles Ragland and Erica Hurd.

The jury convicted Morris of two counts of premeditated first degree murder and one count of aggravated rape.

### Penalty Phase

Dr. O.C. Smith again testified regarding his findings from the autopsy of Erica Hurd, including the blunt trauma, skull fractures, and 37 stab wounds. Dr. Smith said that the wounds would have been painful and that the stab wounds that struck bone would have caused severe pain. Dr. Smith explained that the wounds were "in areas that may be targeted, the face, the head, the chest, the back," and that they showed "sites of selection, as opposed to a random pattern of distribution." Dr. Smith, noting that some of the wounds were severe and others were superficial, testified that it "may imply an element of control ... or it may imply an element of torment by being very superficial in nature."

Several witnesses testified on behalf of the defendant. Mickey Granger, the defendant's employer, testified that Morris was a good, dependable employee who suffered a "downhill slide" in performance when accused of rape shortly before these offenses. Granger became aware of Morris's drug problem when he found a crude crack pipe fashioned from a soft drink can.

Jack Thomas, a friend of the defendant's, testified that when he visited Morris in prison, Morris admitted his responsibility for the killings but denied that he raped Angela Ragland. According to Thomas, Morris said that he had used a large amount of cocaine on the night of the offenses in an effort to overdose. Several other witnesses, including teachers and prison employees, testified that Morris is a good student, participates in class, and is punctual. Several of the witnesses testified that Morris helps others inmates, studies frequently, and uses reference material from the library. The defendant did not testify.

The jury imposed a death sentence for the first degree murder of Erica Hurd after finding that the evidence of two aggravating circumstances—that the murder was "especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and that the murder was "committed while the defendant was engaged in committing ... any first degree murder, rape, burglary or kidnapping"—outweighed mitigating evidence beyond a reasonable doubt. *See* Tenn.Code Ann. § 39–13–204(i)(5) and (7).

The jury imposed a sentence of life without parole for the murder of Charles Ragland after finding that the evidence of two aggravating circumstances—that the defendant "knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder" and that the murder was committed while the defendant was engaged in committing any "first degree murder, rape, burglary or kidnapping"—did not outweigh mitigating evidence beyond a reasonable doubt. Tenn.Code Ann. § 39–13–204(i)(3) and (7). In a separate sentencing hearing, the trial court imposed a 25-year sentence for the aggravated rape conviction and ordered that it be served consecutively to the sentence of life without parole.

The Court of Criminal Appeals affirmed the convictions and the sentences. The case was then docketed in this Court for automatic review.

## ANALYSIS

### Sufficiency of the Evidence

The defendant argues that there was insufficient evidence of premeditation and deliberation to support the first degree murder convictions. The defense theory at trial was that Morris's use of crack cocaine rendered him incapable of forming the culpable mental states to commit the offenses. The State maintains that the evidence was sufficient to support the convictions.

 When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *E.g., State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. *Id.; State v. Cazes*, 875 S.W.2d 253, 259 (Tenn.1994), *cert. denied*, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995).

At the time these offenses were committed, first degree murder included an "intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39–13–202(a)(1)(1991).[6] By statute, "intentionally" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn.Code Ann. § 39–11–106(a)(18)(1991). A "deliberate" act meant one performed with a cool purpose, and a "premeditated" act was one done "after the exercise of reflection and judgment." Tenn.Code Ann. § 39–13–201(b)(1) and (2)(1991).

In *Bland*, we identified and discussed circumstances that, if established by the proof, may warrant the trier of fact to find or infer premeditation. The circumstances include the use of a deadly weapon upon an unarmed victim, the particular cruelty of a killing, any threats or declarations of intent to kill made by the defendant, proof that the defendant procured a weapon, any preparations to conceal the crime undertaken before the crime is committed, and the defendant's calm demeanor immediately after a killing. *Bland*, 958 S.W.2d at 660. The element of deliberation, on the other hand, "requires that the killing be done with a cool purpose—in other words, that the killer be free from the passions of the moment." *State v. West*, 844 S.W.2d 144, 147 (Tenn.1992).

 We agree with the Court of Criminal Appeals' conclusion that the evidence was sufficient to support both first degree murder convictions. The evidence, indeed the defendant's own statement, indicated that Morris confronted Charles Ragland just hours before the offense and warned Ragland that he would "regret disrespecting me." Morris then went to his home, which adjoined the Ragland's, procured a shotgun, loaded it with two shells, and waited for Ragland's wife to arrive home so as to effect his entry into the Ragland's home. Morris abducted Erica Hurd and forced his way into the Ragland's residence at gunpoint.

Once in the home, Morris demanded that Charles Ragland give him "dope" and refused Ragland's offer of money. He fired one shot, forcing Ragland to the

---

**6.** Effective July 1, 1995, the statute was amended to delete the element of deliberation from this definition of first degree murder. Tenn.Code Ann. § 39–13–202(a)(1)(Supp.1996).

floor, and after placing a pillow over Ragland's head, fired one shot into his head from close range. Morris proceeded to put Erica Hurd into a closet and tie Angela Ragland in another room. He covered a window with a mattress. He retrieved Erica from the closet, beat her, and stabbed her 37 times in the face, head, and chest. The medical examiner testified that the wounds were inflicted in a "targeted" fashion that showed "sites of selection." Having killed both Ragland and Hurd, Morris calmly ordered Angela Ragland to bathe him and then fix him something to eat prior to forcing her to engage in sexual intercourse. Before leaving the scene some three hours after the offenses began, Morris tried to wipe off his fingerprints and then hid the shotgun.

Accordingly, the evidence revealed numerous circumstances from which the jury could infer both premeditation and deliberation: the threats against Charles Ragland just prior to offenses; the procurement of a shotgun and ammunition; Morris's lying in wait for an opportunity to enter the victims' home; the use of a deadly weapon on the unarmed Charles Ragland after deliberately covering the victim's head with a pillow; the savage stabbings of Erica Hurd in a severe yet targeted fashion; Morris's calm demeanor in bathing and eating after committing two murders; and Morris's efforts to conceal his fingerprints and hide the murder weapon. Moreover, despite Morris's use of cocaine prior to the offense, his detailed recounting of the offenses in his statement to officers was nearly identical to that of eyewitness Angela Ragland. When viewed under the appropriate standards of appellate review, we conclude that the evidence was legally sufficient to support the jury's verdicts as to both counts of first degree murder.

The defense theory was that Morris was unable to form the culpable mental states of intent and premeditation due to his excessive use of crack cocaine prior to committing the offenses. The trial court allowed evidence of Morris's use of cocaine and properly instructed the jury that a defendant's "voluntary intoxication" could "negate a culpable mental state." *See* Tenn.Code Ann. § 39–11–503(a)(1991).

■ The weight to be given the evidence and the determination of whether the voluntary intoxication negated the culpable mental elements were matters for the jury. Given the overwhelming evidence of Morris's intentional, deliberate and premeditated acts, the jury obviously elected to reject the defense theory. Moreover, the defense theory that Morris's use of cocaine rendered him incapable of forming the culpable mental states was refuted by Morris's own confession in which he recounted the offenses in full detail. Accordingly, we find no merit to Morris's contention that his cocaine use rendered the evidence insufficient to support the jury's verdict as a matter of law.

### Electrocution

■ Throughout these proceedings, the defendant has maintained that electrocution is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution. Conceding that this issue has been rejected by this Court on numerous occasions,[7] the defendant relies on authority from other states and argues that an evidentiary hearing should be held on such issues as the construction of the electric chair, the manner of its use and maintenance, the possibility of malfunction, and the potential harm and suffering inflicted on those executed through electrocution. The State argues that the issue is no longer ripe for review.

Morris was sentenced to the death penalty in January of 1997. As the State notes, in May of 1998, the Tennessee legis-

---

**7.** *E.g., State v. Nichols,* 877 S.W.2d 722, 737 (Tenn.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *State v. Black,* 815 S.W.2d 166, 179 (Tenn.1991).

lature amended statutory law and allowed a defendant who was sentenced to death before January 1, 1999, to sign a written waiver and elect to be executed by lethal injection. Tenn.Code Ann. 40–23–114(c) (Supp.1999). The State argues that the issue is not ripe for review because the defendant has not chosen electrocution as the means of death and that, if he does so, any objection to electrocution is waived.

Since the filing of briefs, the legislature has again amended Tenn.Code Ann. 40–23–114(c), lending further support to the State's argument. As amended, the statute now provides for lethal injection as the default manner of execution in all cases in which a defendant has been sentenced to death. 2000 Tenn. Pub. Acts, ch. 614 (enacted March 30, 2000). A defendant may now waive lethal injection and elect electrocution.

The result of the legislation is this—the defendant is no longer under a penalty of death by electrocution, but rather, death by lethal injection. The issue of whether electrocution is cruel and unusual punishment is no longer properly before the Court. Moreover, the United States Supreme Court has said that a defendant who elects a certain means of death such as electrocution waives his constitutional challenges to the manner of executing the sentence. *Stewart v. LaGrand*, 526 U.S. 115, 119 S.Ct. 1018, 1020, 143 L.Ed.2d 196 (1999).

Accordingly, the defendant is not entitled to relief on this issue.[8]

### Sufficiency of Aggravating Circumstances

In reviewing a sentence of death, we are to determine whether the evidence supports the jury's findings with respect to aggravating circumstances and whether the evidence supports the jury's conclusion that the aggravating circumstances outweighed mitigating factors beyond a rea-

sonable doubt. Tenn.Code Ann. § 39–13–206(c)(1)(1997). We will review each issue in turn.

### Heinous, Atrocious or Cruel

■ The jury found that the murder of Erica Hurd was "especially heinous, atrocious or cruel in that it involved torture or serious physical injury beyond that necessary to produce death." Tenn.Code Ann. § 39–13–204(i)(5). Morris argues that the evidence was insufficient to support this aggravating circumstance because the State did not establish with certainty whether the victim was alive and conscious when she was stabbed to death.

We have defined "torture" as "the infliction of severe mental or physical pain upon the victim while he or she remains alive and conscious." *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985); *State v. Mann*, 959 S.W.2d 503, 511 (Tenn.1997), *cert. denied*, 524 U.S. 956, 118 S.Ct. 2376, 141 L.Ed.2d 743 (1998). We have defined "serious physical abuse beyond that necessary to produce death" as follows:

> Because the legislature added the words 'serious physical abuse,' it must be assumed that the legislature intended the words ... to mean something distinct from 'torture.' The word 'serious' alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be 'beyond that' or more than what is 'necessary to produce death.' 'Abuse' is defined as an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'

*State v. Odom*, 928 S.W.2d 18, 26 (Tenn.1996)(quoting Black's Law Dictionary 11 (6th ed.1990)).

The evidence revealed that Erica Hurd was present when Morris shot Charles Ragland in the head at close range. She was then forced into a closet while Morris

---

8. We express no opinion on the constitutionality of lethal injection as the defendant did

not have the opportunity to raise or litigate that issue in the courts below.

tied up Angela Ragland in another room. When Hurd was retrieved from the closet, Angela Ragland testified that she heard the victim pleading for her life, screaming, and gasping for air for fifteen or twenty minutes. The medical examiner testified that the victim suffered blunt trauma to her head that resulted in fracturing of her skull and 37 stab wounds in the face, head, back and chest. The medical examiner testified that 23 of the stab wounds were inflicted while the victim was still alive and that the stab wounds that struck bone would have caused severe pain. According to the medical examiner, the wounds were inflicted in a targeted, selective manner.

The evidence overwhelmingly supports both torture and serious physical injury beyond that necessary to produce death. *E.g., State v. Mann*, 959 S.W.2d at 511 (victim beaten, strangled and stabbed 11 times); *State v. Bush*, 942 S.W.2d 489 (Tenn.), *cert. denied*, 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997)(victim beaten and stabbed 43 times); *State v. Smith*, 868 S.W.2d 561 (Tenn.1993), *cert. denied*, 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994)(victim shot, throat slashed, and stabbed). We therefore conclude that the evidence in this case was sufficient to support the jury's finding that the murder was "especially heinous, atrocious or cruel in it that involved torture or serious physical injury beyond that necessary to produce death."

### Murder Committed During Felony

■ The jury also found that the murder of Erica Hurd was committed while the defendant "was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after having committed or attempted to commit any first degree murder, rape, burglary or kidnapping." Tenn. Code Ann. § 39–13–204(i)(7)(Supp.1994).[9] Morris argues that the evidence was insufficient to support this aggravating circumstance because the evidence did not reveal that a felony was committed during the murder of Erica Hurd and the jury made no findings in this regard.

In *State v. Terry*, 813 S.W.2d 420 (Tenn. 1991), we discussed the application of this aggravating circumstance and the issue of whether the evidence supports a finding that another felony has been committed during a murder:

> Whether the evidence supports a finding that the murder was committed in the course of, during, or while engaged in the commission of another felony ... generally depends on an analysis of the temporal, spatial and motivational relationships between the capital homicide and the collateral felony, as well as on the nature of the felony and the identity of its victim.

*Terry*, 813 S.W.2d at 423.

In *Terry*, the defendant had been stealing money from his church congregation over a period of months and then subsequently killed a church employee. We found that the evidence did not support a finding of a "nexus" between the murder and the perpetration of a larceny. In contrast, we observed that the aggravating circumstance had been properly applied in numerous cases where the murder involved the victim of the felony, a witness to the felony, or a police officer attempting to apprehend the defendant after the commission of the felony, and was committed "within close temporal proximity to the commission of the aggravating felony." *Id.* at 424; *see also State v. Hall*, 958 S.W.2d 679, 693 (Tenn.1997), *cert. denied*,

---

9. Although this aggravating circumstance lists other felonies as well, the trial court properly charged the jury only on those that were raised by the evidence. *See* Tenn.Code Ann. § 39–13–303 (1991)(rape); Tenn.Code Ann. § 39–14–402 (1991)(burglary); Tenn.Code Ann. § 39–13–303 (1991)(kidnapping). In

*State v. Blanton*, 975 S.W.2d 269, 281 (Tenn. 1998), *cert. denied*, 525 U.S. 1180, 119 S.Ct. 1118, 143 L.Ed.2d 113 (1999), we held that the trial court erroneously charged the jury on every felony contained in the aggravating circumstance but that the error was harmless.

524 U.S. 941, 118 S.Ct. 2348, 141 L.Ed.2d 718 (1998)(applying *Terry* and concluding that the aggravating circumstance was applicable because the felony of arson was committed when the defendant murdered the victim by setting fire to the car she occupied).

■ Moreover, although the analysis must focus upon the relationship between the felony and the murder, it is not required that the felony be committed either before or contemporaneously with the murder. *See State v. Wright,* 756 S.W.2d 669, 673 (Tenn.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 848, 102 L.Ed.2d 979 (1989)(where evidence showed two killings occurred within short period of time, precise sequence was not dispositive of whether aggravating circumstance was applicable); *State v. Jones,* 288 S.C. 1, 340 S.E.2d 782, 784 (1985)(rape of second victim occurred after murder but aggravating circumstance applied because the offenses were a continuous series of acts with no significant lapse of time).

Here, Erica Hurd was a witness to Morris's burglary of the residence as he forced his way in at gunpoint; she was a witness to Morris's murder of Charles Ragland; and she was the victim of a kidnapping when Morris forced her into the closet. Hurd was murdered just moments after the commission of these offenses and just before Morris's aggravated rape of Angela Ragland. All of these offenses were committed at the same place, close in time, and as part of Morris's single criminal spree against these three victims. There was no distinction or separation of these offenses with regard to time, location, motivation or any other factor that would render this aggravating circumstance inapplicable. We therefore conclude that the evidence was sufficient to support the jury's finding.

### Mitigating Factors

We now turn to the question of whether the evidence supported the jury's determination that the two aggravating circumstances outweighed the evidence of mitigating circumstances.

■ The Eighth and Fourteenth Amendments to the United States Constitution and article I, § 16 of the Tennessee Constitution require that a sentencer in a death penalty case consider mitigating evidence. *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990); *State v. Cauthern,* 967 S.W.2d 726, 738 (Tenn.), *cert. denied,* 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998). The sentencer is permitted to hear evidence about the defendant's background, record and character, as well as any circumstances about the offense that may mitigate against the death penalty and serve as a basis for imposing a lesser sentence. *Cauthern,* 967 S.W.2d at 738; *see also* Tenn.Code Ann. § 39–13–204(j) (1997).

■ Morris argues that the evidence supported numerous mitigating circumstances, including: that his judgment was impaired due to his use of crack cocaine; that he was under extreme mental and emotional disturbance at the time of the crime; that he released Angela Ragland; that he had been a good, dependable employee; that he is a good prisoner and student; and that he accepted responsibility for the crimes. We observe that there was evidence in the record to support several of these mitigating circumstances— indeed, in imposing a sentence of life without parole for the murder of Charles Ragland, it is obvious that the jury gave careful consideration to the mitigating evidence.

■ Whether mitigating evidence exists and the weight to be given to aggravating and mitigating circumstances are issues for the jury. *Bland,* 958 S.W.2d at 661. Given the overwhelming strength of the two aggravating circumstances, and the jury's careful consideration of the mitigating evidence, we conclude that the evidence is sufficient to support the jury's finding that the aggravating circumstances

outweighed mitigating evidence beyond a reasonable doubt.

### *Proportionality*

■ Where a defendant has received a death sentence, we must apply a comparative proportionality analysis. Tenn.Code Ann. § 39–13–206(c)(1)(1997). The review is designed to identify aberrant, arbitrary or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." *Bland,* 958 S.W.2d at 662 (quoting *Pulley v. Harris,* 465 U.S. 37, 42–43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. *Bland,* 958 S.W.2d at 668.

■ We employ the precedent-seeking method of comparative proportionality, by which we compare a case with cases involving similar crimes and similar defendants. *Bland,* 958 S.W.2d at 667. We consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on other victims.

■ We also consider numerous factors about the defendant: (1) prior criminal record; (2) age, race and gender; (3) mental, emotional and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.* at 667. Since no two defendants and no two crimes are precisely alike, our review is not mechanical or based on a rigid formula. *Id.* at 668. Similarly, that a defendant in a similar case or even the same case has received a sentence less than death does not render a death sentence arbitrary, excessive or disproportionate. *State v. Cauthern,* 967 S.W.2d at 741.

■ In this case, the evidence showed that the defendant had a confrontation with one of the victims, Charles Ragland, a short time before the offenses. He procured his shotgun, loaded it with two shells, and waited for an opportunity to gain entry to the Raglands' home. When that opportunity came, Morris forced his way into the home by holding a second victim, 15–year–old Erica Hurd, at gunpoint. He demanded drugs, refused Charles Ragland's offer of money, and shot Ragland in the head at close range. He forced Erica Hurd into a closet and tied up a third victim, Angela Ragland. When he retrieved Hurd from the closet, he beat her and stabbed her 37 times. After killing two unarmed victims in brutal fashion, Morris took a bath, ate a meal, and forced Angela Ragland to engage in sexual intercourse. There was no provocation or justification for Morris's actions, which were at all times intentional, deliberate, and premeditated.

We have found the death penalty neither excessive nor disproportionate in many similar cases involving brutal and gruesome facts that supported the "heinous, atrocious or cruel" aggravating circumstance. *E.g., State v. Carter,* 988 S.W.2d 145 (Tenn.1999)(defendant broke into victims' home, shot husband in head, raped wife and shot her in the head); *State v. Mann,* 959 S.W.2d at 511 (defendant broke into victim's home, beat and raped the victim, and stabbed her 11 times); *State v. Bush,* 942 S.W.2d at 507 (defendant broke into victim's home, beat the victim and stabbed her 43 times); *State v. Cazes,* 875 S.W.2d at 259 (defendant broke into victim's home, beat and raped the victim); *State v. Jones,* 789 S.W.2d 545 (Tenn.1990)(defendant broke into victim's home, bound, gagged and stabbed victim); *State v. West,* 767 S.W.2d 387 (Tenn.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3254,

111 L.Ed.2d 764 (1990)(defendant broke into victims' home, raped and stabbed mother and daughter); *State v. Cone*, 665 S.W.2d 87 (Tenn.), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 357 (1984)(defendant broke into victims' home and beat victims to death). Moreover, as can be seen, in each of these cases the defendant broke into the victim's residence before committing the murders.

Similarly, the death penalty has been upheld where the jury, as it did in this case, found the felony murder aggravating circumstance based on a kidnapping, rape, murder or burglary. *State v. Mann*, 959 S.W.2d at 512; *State v. Smith*, 868 S.W.2d at 583; *State v. West*, 767 S.W.2d at 397. Finally, like the present case, numerous cases have involved multiple victims in addition to the murder of the victim for whom the death penalty was imposed. *State v. Smith*, 868 S.W.2d at 583; *State v. Payne*, 791 S.W.2d 10, 12 (Tenn.1990); *State v. Jones*, 789 S.W.2d at 550; *State v. Henley*, 774 S.W.2d 908, 917 (Tenn.1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 800 (1990); *State v. West*, 767 S.W.2d at 397; *State v. Cone*, 665 S.W.2d at 90.

With regard to the characteristics of the defendant, the record indicated that Morris, age 37, was a good employee, student and prisoner. He contends that he has the potential for rehabilitation, adapting to incarceration, and that he accepted responsibility for his conduct. We observe, however, that Morris did not testify in mitigation and did not express any remorse whatsoever when confessing the offenses to police officers.

■ The defendant offers two primary reasons in support of his contention that the death sentence is disproportionate: that the evidence did not support the aggravating circumstances; and that the defendant committed the offenses while suffering the effects of crack cocaine. We have already addressed the first argument by having found that the evidence was sufficient to support both aggravating cir-

cumstances. With regard to the second argument, we observe that the death penalty has been upheld in numerous cases where the defendant argued that the offense was mitigated by intoxication due to drugs or alcohol. *E.g., State v. Payne*, 791 S.W.2d at 16; *State v. Henley*, 774 S.W.2d at 912; *State v. O'Guinn*, 709 S.W.2d 561 (Tenn.), *cert. denied*, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986); *State v. Cone*, 665 S.W.2d at 90. Moreover, although drug usage or intoxication has been evident in some cases in which the defendant received a sentence less than death, *e.g., State v. Gregory*, 862 S.W.2d 574 (Tenn.Crim.App.1993), it does not alone render a death sentence arbitrary, excessive or disproportionate.

Accordingly, having reviewed the nature and circumstance of the offense and the characteristics of this defendant pursuant to the analysis in *Bland*, we conclude that the death sentence imposed in this case was not arbitrary, excessive, or disproportionate.

## CONCLUSION

We have reviewed the entire record and the arguments raised in this case and we conclude that the evidence was sufficient to support the conviction and that the issues raised by the defendant do not warrant relief. We have also determined that the evidence supported the jury's findings of two aggravating circumstances, that the evidence supported the jury's finding that these aggravating circumstances outweighed mitigating evidence beyond a reasonable doubt, and that the death sentence in this case was not arbitrary, excessive, or disproportionate.

Accordingly, we affirm the decision of the Court of Criminal Appeals and attach hereto as an appendix the relevant portions of that opinion. The sentence of death is affirmed and shall be carried out on the 10th day of October, 2000, unless otherwise ordered by this Court or proper authority. It appearing that the defen-

dant, Ferris Genner Morris, is indigent, the costs of appeal are taxed to the State.

DROWOTA, J., not participating.

### APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
JANUARY SESSION, 1999

Feb. 5, 1999.

State of Tennessee, Appellee

vs.

Farris Genner Morris, Jr., Appellant

No. 02C01–9801–CC–00012
Madison County
Hon. Franklin Murchison, Judge
Capital Case
(Premeditated First Degree Murder, Two Counts; Aggravated Rape)

George Morton Googe, District Public Defender, Jackson, Daniel J. Taylor, Assistant Public Defender, Jesse H. Ford, III, Jackson, for Appellant.

John Knox Walkup, Attorney General and Reporter, Michael E. Moore, Solicitor General, Elizabeth T. Ryan, Assistant Attorney General, Criminal Justice Division, Nashville, James G. (Jerry) Woodall, District Attorney General, Al Earls, Asst. District Attorney General, Jackson, for Appellee.

### *OPINION*

DAVID G. HAYES, Judge.
(Deleted Summary of Testimony)

### Background

#### A. Guilt/Innocence Phase

. . . .

... During this interview, the appellant made the following statement:

On September 16, 1994, I got off of work at 1:00 [p.m.]. I bought $250 worth of cocaine during the evening. I made several purchases. I smoked the whole $250 worth up.

Around 1:00 a.m. on September the 17th, 1994, I was sitting on my porch at 120 Ridgemont. My next door neighbor rode up with someone. He got out and came to the duplex. I asked him what was up. I asked dude, 'Why don't you sell me something?' He said he didn't sell dope. I asked him why he would walk out of his house every day and not speak to me, why he didn't show me any respect? He said he didn't have to listen to me and that he was going in his house and going to bed. I told him he was going to regret disrespecting me. I went into my house. I knew that his wife wasn't at home yet. I knew that she would come in sooner or later. I got my shotgun from my bedroom. I loaded two shells into it. I sat in my living room waiting to hear her pull up.

I heard his wife and someone else pull up, but I missed them. They went in the house and locked the door behind them, I assumed.

I heard someone go out to the car. I looked out and it was his wife. When she opened the door, I got behind her with the shotgun. I pointed it at her and walked in behind her. A young girl was on the couch. I told her to get up. I told them to walk on back to the bedroom. They went into the bedroom and got onto the bed. The girl's husband was lying on the bed. I told him to give me the dope. He said he didn't have any. I fired the shotgun into the floor. He rolled off the bed. I asked him again for the dope. He said he didn't have any. He asked me if I wanted money. I told him, 'No, I don't want your money.'

I picked a pillow up off of the bed and put it over the barrel of the shotgun and I shot him. The girls were on the bed under a blanket or something. I tried

to put the young girl in the closet. She started acting crazy. We were in the hallway. She picked up a knife from somewhere. We struggled from the hallway into the front room. We wrestled on the couch. I took the knife from her. I laid the shotgun on the couch. I stabbed her down low with the knife. I hit her with my hand. I think I broke my finger. I can't raise it back up. Before the struggle with the young girl, I had put her in the hall closet. I took the dude's wife into the other bedroom. I had her tied down on the big bed to the right as you walk into the bedroom. I used a black belt and some type of material to tie her hands and feet. It was dark in the room.

I went to the closet and got the young girl out. That's when she started to struggle and acting crazy, as I explained earlier. My intentions for getting her out of the closet was to tie her up, but she got to struggling and got the knife. After I stabbed her and she was lying there on the couch, I went and got a blanket that was already in the living room. I covered the young girl up. The dude's wife didn't want to see her. I went into the bedroom and untied the other girl and we talked. We talked in the bedroom for a while. I told her I wanted to take a bath. We went into the bathroom. I undressed by taking off my pants and shirt. . . . I got in the tub and I told her to take my shorts off of me. She did. She gave me a bath. I held a gun in my hand.

We went back to the bedroom. I dried off with a sheet. I asked her if she had anything to eat. She fixed me a sandwich and Kool–Aid. I ate and then I laid the shotgun on the other bed and we had sex. We had sex three or four times. She gave me oral sex. I took the mattress off the other bed and put it up against the window because of the light coming through. She didn't act afraid.

About 6 or 7 this morning I told her I was going to let her go. I told her not to try and make a story up, just do what she was supposed to do.

I put my clothes in a plastic bag and took them home. I put the bag in the trash can in the bedroom where my dope was. I put the shotgun up under the chest of drawers in my bedroom.

## (Deleted B. Penalty Phase)

### I. Motion to Suppress

Nine hours after his arrest on September 17, 1994, the appellant executed a written waiver of his *Miranda* rights and provided law enforcement officers a complete statement of his involvement in the deaths of Charles Ragland and Erica Hurd and the aggravated rape of Angela Ragland. *See supra.* Prior to trial, the appellant filed a motion to suppress this statement alleging that the statement was not knowingly and voluntarily given due to the fact that he was under the influence of crack cocaine. A hearing on the motion was heard on September 10, 1996.

The evidence at the suppression motion revealed that the appellant had been smoking crack cocaine on the evening of Friday, September 16, 1994. Russell Morris, the appellant's brother, verified that, when he saw the appellant at 5:30 p.m. that evening, the appellant had informed him that he had spent $200 on crack cocaine and was going to obtain more. He also testified that the appellant appeared to be intoxicated. Next, the defense attempted to call the victim, Angela Ragland, to the stand to testify regarding the appellant's appearance and actions during the commission of these offenses. The State objected on the basis that Angela Ragland was not "in any position to know anything about the condition that [the appellant] was in at the time that the statement was given." The trial court sustained the State's objection on the same ground, expressly finding that Ms. Ragland had no knowledge of the appellant's state of mind or whether he was under the

influence of cocaine when he gave his statement some fourteen hours after he committed these offenses.

Dr. Robert Parker was called as an expert witness on the effects of crack cocaine on the human body. *See supra.* Specifically, Dr. Parker testified that mania was present during the "crash phase" when the appellant's statement was given. He explained that, during the "crash phase," one's judgment was impaired and usually was accompanied with confusion and suicidal thoughts. Moreover, "crash phase" symptoms could cause one not to care about or understand the consequences of their actions.

At the conclusion of Dr. Parker's testimony, the defense again attempted to introduce the testimony of Angela Ragland. However, the trial court refused to admit such testimony finding that "there's been no proof here presented, notwithstanding the use of cocaine, that he, because of the ingestion of cocaine, didn't understand what he was doing when he gave his statement. There's been no proof of that."[1]

The defense then offered to call the appellant to testify regarding "how [the drugs] affected his body, ... the way he was ... acting, how he was feeling about those things at the time he gave his statement and before that." Defense counsel asked the court to limit the examination of the appellant to these matters and to prohibit questioning as to the "facts of what happened on this alleged incident about the killings." The trial court refused this request, finding that there was no reason to prohibit the State from eliciting the contents of the statement on cross-examination and how it "reflects the truth of what occurred." Moreover, the trial court concluded that the appellant "can't exercise [his] Fifth Amendment privilege on examination of things which are relative to the things that he said...." After this ruling, the defense elected not to call the appellant to the stand.[2]

The defense next called Officer James Golden to the stand. Officer Golden testified that he first encountered the appellant between 8:30 and 9:00 a.m. on the morning of September 17, 1994. At this time, the appellant "appeared normal to [him]." Later that afternoon, approximately 5:20 p.m., Golden, accompanied by Officer Willis, advised the appellant of his *Miranda* rights, witnessed the appellant waive these rights, and proceeded to obtain a confession from the appellant. Investigator Golden testified that, at the time the statement was obtained, the appellant did not appear to be under the influence of crack cocaine.

No further proof was presented. Based on this evidence, the trial court denied the appellant's motion to suppress. The trial court stated:

> ... The basic premise here is that when he gave the statement, that statement was not the product of a free mind and rational intellect.
>
> ...

---

1. At the conclusion of the appellant's proof, the trial court permitted defense counsel to make an offer of proof regarding the proffered testimony of Angela Ragland. Specifically, defense counsel stated that Angela Ragland would testify that she observed the appellant sweating and in an agitated state, talking and moving at a rapid pace, and looking for drugs when he came to her residence. Defense counsel contended that this testimony was corroborative of Dr. Parker's testimony regarding the effects of crack cocaine on a person.

2. At this point at the suppression hearing, the defense did make an offer of proof relative to the appellant's anticipated testimony. Specifically, the proof would show that the appellant and Darryl Godwin purchased $250 worth of crack cocaine on September 16, 1994. Later that same day, the appellant purchased an additional $200–$250 worth of crack cocaine. The appellant consumed the entire amount of crack cocaine, with his cocaine binge ending at approximately 11:00 p.m. The appellant would further allege that he was in the "crash phase" at the time he gave his statement to the police.

... The only proof that we have is from Officer Golden who said he was normal.

...

Now to adopt your idea, I would have to say that the rule of law is that you could prove that a person has had drugs. There's an inference that he didn't know—— that he couldn't give a rational statement. There is no such inference that's drawn from the proof that a person has used drugs that they can't give a good statement. You've got to first give me some proof that he didn't give a good statement.

...

... Well, what you've done is given me the corroborative proof, but you don't have any proof—— You have zero proof that the statement ... was the product of an irrational mind. You have zero proof of that.

The appellant now contests the ruling of the trial court arguing (1) that the trial court erred in refusing to permit Angela Ragland to testify at the hearing and (2) that the testimony of Dr. Parker was sufficient to show that the appellant was in the "crash phase" of cocaine intoxication, suffering from impaired judgment, confusion, and suicidal thoughts, at the time his statement was given to the police.

## Analysis

The trial court's determination that a confession has been given voluntarily and without coercion is binding upon the appellate court unless the evidence preponderates against the ruling. *See State v. Odom*, 928 S.W.2d 18, 22 (Tenn.1996); *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn.), *reh'g denied*, (1994). Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. *Odom*, 928 S.W.2d at 23. On appeal, the appellant bears the burden of demon-strating that the evidence preponderates against the trial court's findings. *See State v. Tate*, No. 02C01–9605–CR–00164, 1997 WL 746441 (Tenn.Crim.App. at Jackson, Dec. 3, 1997), *perm. to appeal denied*, (Tenn. Oct. 5, 1998) (citation omitted).

The law in this state is well-established that "[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." *See State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim.App.1980), *cert. denied*, 454 U.S. 1096, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); *see also State v. Beasley*, No. 03C01–9509–CR–00268, 1996 WL 591203 (Tenn.Crim. App. at Knoxville, Oct. 10, 1996), *reh'g denied*, (Sept. 15, 1997), *perm. to appeal denied*, (Tenn. Apr. 27, 1998); *State v. Teeters*, No. 0201–9304–CC–0051, 1994 WL 29855 (Tenn.Crim.App. at Jackson, Feb. 2, 1994). "It is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." *Robinson*, 622 S.W.2d at 67 (citing *Lowe v. State*, 584 S.W.2d 239 (Tenn.Crim.App.1979)). The test to be applied in these cases is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime. *Beasley*, No. 03C01–9509–CR–00268 (citations omitted).

In the present case, the defense presented the testimony of Officer Golden who stated that, at the time the appellant's statement was obtained, the appellant was acting normal, was calm, and did not appear to be under the influence of cocaine. He further testified that the appellant provided a complete narrative of the events surrounding the double homicides/aggravated rape. No proof was presented to rebut this observation other than the expert testimony of Dr. Parker whose testimony was limited to the general effects of cocaine intoxication and not those effects actually experienced by the appellant. Indeed, we find no proof that preponderates against the trial court's finding that the

appellant made a voluntary and knowing statement to law enforcement officials.

Moreover, we conclude that the trial court properly prohibited the defense from calling Angela Ragland to the stand. Per the appellant's offer of proof, Angela Ragland would only have been able to testify about the appellant's state of mind and physical condition during the actual perpetration of the crimes, which was not at issue at the suppression hearing. There is no dispute that the appellant had ingested a large amount of crack cocaine the prior evening and was intoxicated at the time the crimes were committed. However, Ms. Ragland *was not present* at the time the appellant's statement was given, some fourteen hours after the crimes occurred, and, therefore, could not testify regarding his demeanor during the police interview, *i.e.*, the issue at the suppression hearing. *See* Tenn. R. Evid. 402 and 602. Accordingly, the motion to suppress was properly denied. This issue is without merit.

## II. *Witherspoon* Violations

The appellant next contends that the jury selection process in his capital trial violated *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Specifically, he argues that the statements of two of the prospective jurors, Barbara Brooks and Dennis Spellings, concerning the death penalty did not justify their excusal for cause.

"The right to trial by jury secured by our state and federal constitutions necessarily contemplates that the jury will be unbiased and impartial." *See Wolf v. Sundquist*, 955 S.W.2d 626, 629 (Tenn. App.), *perm. to appeal denied*, (Tenn.1997) (citing *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946); *Ricketts v. Carter*, 918 S.W.2d 419, 421 (Tenn.1996); *Durham v. State*, 182 Tenn. 577, 188 S.W.2d 555, 558 (1945)). "In its constitutional sense, impartiality envisions not only freedom from jury bias against the defendant but also freedom

from jury bias in the defendant's favor." *Id.* (citing *Swain v. Alabama*, 380 U.S. 202, 219–20, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965); *Hayes v. Missouri*, 120 U.S. 68, 70–71, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887); *Houston v. State*, 593 S.W.2d 267, 272 (Tenn.1980), *rev'd on other grounds*, *State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992); *Toombs v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954)). Essentially, an impartial juror is one who is free from personal bias or prejudice and will find the facts and apply them to the law. *See Wolf v. Sundquist*, 955 S.W.2d at 629; *see also Buchanan v. Kentucky*, 483 U.S. 402, 417, 107 S.Ct. 2906, 2914, 97 L.Ed.2d 336 (1987); *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 851–52, 83 L.Ed.2d 841 (1985); *Eason v. State*, 65 Tenn. 466, 469 (1873).

To ensure an impartial jury, the Tennessee Supreme Court has adopted the rationale of the United States Supreme Court in determining the eligibility of prospective jurors in a capital case. In *Witherspoon v. Illinois*, the Supreme Court held that a prospective juror may be excluded for cause because of his or her views on capital punishment. This standard was clarified in *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852:

> That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon's* reference to "automatic decision making," this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."

*See also State v. Alley*, 776 S.W.2d 506 (Tenn.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990); *State v. Williams*, 690 S.W.2d 517, 522 (Tenn.1985). The Supreme Court also acknowledged that the questions asked and answered during the voir dire process do not always reveal a juror's bias with absolute certainty; "however, there will be sit-

uations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *See Wainwright v. Witt,* 469 U.S. at 425–26, 105 S.Ct. at 853. Therefore, "deference must be paid to the trial judge who sees and hears the juror." *Id.* Indeed, in *State v. Alley,* our supreme court held that "the trial court's finding of bias of a juror because of his views of capital punishment shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that determination was erroneous." *Alley,* 776 S.W.2d at 518; *see also Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

## A. Prospective Juror Brooks

During individual voir dire, Barbara Brooks was called as a potential juror. When asked by District Attorney General Woodall whether she could impose the death penalty in this case, Ms. Brooks responded that she could not do so for religious reasons. Despite further questioning by General Woodall, Ms. Brooks maintained that she did not believe in the death penalty and that she could not and would not impose such a sentence.

The trial court, as well, questioned Ms. Brooks regarding whether she could impose the death penalty. In response to the court's questioning, she again stated that she could not impose the death penalty no matter what the crime was because she does not "believe that a person's life should be taken because of it." She further admitted that "the death penalty is out of the question for [her]" and she would never consider imposing the death penalty on the appellant or anyone else.

Defense counsel, in an attempt to rehabilitate Ms. Brooks, asked her whether she could fairly consider the aggravating and mitigating circumstances and keep an open mind as to the three possibilities for sentencing in this case, to which Ms. Brooks responded affirmatively. The court again questioned Ms. Brooks as to whether she could impose the death penalty if it was called for by the law and the facts. Although Ms. Brooks responded that she could consider the sentence of life without the possibility of parole and that she could hear the evidence, she stated "I don't think I could be fair at that because of the death penalty . . . the only thing that hinders me is when you said death penalty. That's where it stops with me."

Despite this statement, defense counsel was again able to illicit answers from Ms. Brooks that raised concern as to her position on the death penalty. As a result, the trial court instructed Ms. Brooks to "just say how you feel." After further equivocation by the prospective juror, the trial court asked her point blank if the death penalty was out; she responded, "Forget it."

At that point, the State challenged Barbara Brooks for cause and the court sustained the challenge finding:

> . . . I finally put it to her as blank, I said, "The death penalty is out?" She said, "The death penalty is out, the death penalty is out. I will not impose it" and she said it multiple, multiple times.

Although Ms. Brooks' position on the death penalty was ambiguous at certain times during her voir dire examination, we can reach no rational conclusion other than finding that Ms. Brooks had a definite opposition to imposing the death penalty. Giving deference to the trial court who was able to observe this prospective juror, we conclude that the constitutional standard for excusing jurors due to their views on the death penalty was met.

## B. Dennis Spellings

Later that same day, Dennis Spellings was called for individual voir dire. The following dialogue occurred between Mr. Spellings and General Woodall:

GENERAL WOODALL: ... Can you fairly consider the death penalty along with other forms of punishment?

MR. SPELLINGS: That's a tough question.

GENERAL WOODALL: As it should be.... [T]he law in the State of Tennessee is if the aggravating circumstances ... outweigh the mitigating circumstances, you shall impose the death penalty. Can you do that or do you have personal convictions or religious convictions that would prevent you from doing it?

MR. SPELLINGS: It's a tough question to ask straight forward. I really don't have an answer.

...

GENERAL WOODALL: Well, can you make that decision? Do you think that you could vote to impose the death penalty?

MR. SPELLINGS: Honestly I don't.

GENERAL WOODALL: Are you saying you don't think you could or maybe you could or you just don't know?

MR. SPELLINGS: When we're talking about when push comes to shove, I don't know.

GENERAL WOODALL: ... So are you saying you don't know whether you could or you won't?

MR. SPELLINGS: I don't know.

Defense counsel also attempted to elicit a definite position from Mr. Spellings, but was unsuccessful. The trial court interrupted and asked Mr. Spellings, "After you hear all the proof, then you could make a decision as to whether or not death should apply?" Mr. Spellings responded, "I'll be honest with you. I'd rather not make that decision." During the court's discourse with Mr. Spellings, Mr. Spellings replied, at one point, that he could follow the law as instructed by the court, but later admitted that "he did not know" if he could follow the law as related to the death penalty.

The State challenged Mr. Spellings for cause, relying on Mr. Spellings admission that he did not know whether he would follow the law. The trial court sustained the challenge, explicitly finding:

This is the first time we've run into this where a person just ... won't answer the question or he feels like he can't answer the question. As I interpret the law that means that we have to get commitment from a juror that they would follow the law and that they would consider the death penalty under certain circumstances. I don't think that a juror is disqualified if they just continue to persistently say, "I don't know what I would do." That's like a juror who's really saying— will you affirm to uphold the law and he would say, "Well, I just can't answer that." If you had a juror and you put him in the box and you say "Do you swear to tell the truth?" and he says, "I can't say whether I will or not," you wouldn't let him testify. It takes an affirmative statement by a juror that he would consider all the penalties ... and would not exclude the death penalty as a possibility. I think the statements by this juror render him unqualified to served on the jury.

Again, this court gives deference to the decision of the trial court who was able to observe the prospective juror. The record demonstrates that Mr. Spellings could not state with certainty that he could perform his duties as a juror in accordance with his oath. Accordingly, the trial court properly excused this juror for cause. This issue is without merit.

**(Deleted—III. Sufficiency of the Evidence)**

**IV. Statement of Intent of Future Wrongdoing and Prior Bad Act**

Prior to the testimony of Angela Ragland, a jury-out hearing was held to determine the admissibility of testimony regarding the appellant's prior rape charge and

statements made by the appellant to Angela Ragland regarding his intent to kill Marvin Eckford, to rob a bank, and to leave town. The trial court permitted the introduction of the testimony, finding that

> it would be rare that any statements made by any defendant during the course of a criminal enterprise to be excluded if there are crimes that require proof of culpability, state of mind, et cetera, they would usually be considered res gestae, so closely connected with the crime, with the offense, that they can't be separated from it. All of these statements reflect upon that, that he is on a killing spree, going to kill ... that clearly is some proof of the defendant's mental state, that he was on a violent binge. You know, he commits one murder, he commits two murders, he might as well commit three, what-difference-does-it-make sort of attitude. It's also proof of, of course, the mental state. Words like, "I've been accused of one rape" ... [w]ould serve as a motive. That's another thing, motive, intent, state of mind.... Certainly shows intent ... that he knew what he had done.... Arguably evidence that the defendant was coherent, that he knew what he had done, he knew what he was going to do and that he had presence of mind about all of these things.... In summary, all of these remarks are clearly admissible.... But all of these things, particularly when you're thinking about the requirements of culpability being proven, when you're thinking about the position that's going to be taken.... Statements made during the course of the crime or even afterwards which would reflect upon the defendant's thinking, mental state, what he had on his mind, and all of these things do that. So they're going to be admissible for these numerous reasons, not to mention res gestae.

## A. Statements of Future Intent

Again, during the guilt phase of the appellant's trial, the trial court permitted the State to question Angela Ragland about statements made to her by the appellant. On direct examination, Angela Ragland testified that, between instances of rape, the appellant told her that he was going home to tell his children goodbye, that he was going to kill Marvin Eckford because Eckford had provided his name to the woman accusing the appellant of raping her, and that he was going to rob a bank and leave town. On appeal, the appellant contends that such evidence is irrelevant and is unduly prejudicial.

The trial court correctly found such testimony admissible under the "state of mind" exception to the hearsay rule. *See* Tenn. R. Evid. 803(3); *State v. Roe*, No. 02C01–9702–CR–00054, 1998 WL 7107 (Tenn.Crim.App. at Jackson, Jan. 12, 1998); Neil P. Cohen et al., *Tennessee Law of Evidence* § 803(3).2 (3d ed.1995). The testimony is relevant to show the appellant's existing state of mind at the time of the crimes, *i.e.*, to show his intent, plan, and motive, including the fact that he was capable of understanding the import of his actions. *Id.; see also* Tenn. R. Evid. 402. Moreover, the trial court instructed the jury that the appellant did not kill Marvin Eckford, did not rob a bank, and did not leave town. Accordingly, we cannot conclude that introduction of this evidence was more prejudicial than probative. *See* Tenn. R. Evid. 403. This issue is without merit.

## B. Evidence of Prior Bad Act: Alleged Rape

Angela Ragland also testified that, during the crimes, the appellant told her that "[h]e had been accused of raping someone and that he didn't, and if he was going to go to jail, he was going to go to jail for doing something." The appellant objected and a jury-out hearing was held to conduct a Tenn. R. Evid. 404(b) analysis. The trial court found the testimony admissible, but

determined that it should only be considered on the issue of mental intent. The trial court instructed the jury that "they're not to presume that he's guilty of any previous rape."

Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Nonetheless, such evidence may be admissible for other purposes. *Id.* Other acts may be admitted to prove such issues as motive, intent, knowledge, absence of mistake or accident, common scheme or plan, identity, completion of the story, opportunity, and preparation. Neil P. Cohen et al., *Tennessee Law of Evidence* § 404.6. Thus, the trial court properly found that testimony concerning the alleged rape was admissible pursuant to Tenn. R. Evid. 404(b), as it was highly relevant to the issue of intent and its probative value outweighed the danger of unfair prejudice.

### V. Photographs of Victim at Sentencing Phase

During the sentencing phase, the State was permitted, over objection, to introduce multiple photographs of the body of the deceased victim, Erica Hurd.[3] The trial court permitted the introduction of the photographs on the issue of establishing the aggravating circumstance "heinous, atrocious, or cruel." On appeal, the appellant complains that the admission of the photographs was error. Specifically, he argues that (1) the photographs were more prejudicial than probative and (2) the photographs were cumulative to the testimony of Dr. Smith and the demonstrative evidence of the mannequin.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978)

(citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* However, before a photograph may be admitted into evidence, it must be relevant to an issue that the jury must decide and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. *See State v. Braden*, 867 S.W.2d 750, 758 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1993) (citation omitted); *see also* Tenn. R. Evid. 401 and 403.

Of the ten photographs contested on appeal, two are of the victim at the crime scene and the remaining are photographs from the autopsy. Eight of the ten photographs depict wounds to the victim's face and neck. The appellant contends that the facial pictures are unduly prejudicial in that they are "gruesome and inflammatory" and the "facial expression on the victim's face ... could produce a terrible reaction in the jury." The appellant argues that the introduction of the photographs was unnecessary and cumulative due to the testimony of Dr. Smith describing the wounds and his use of a mannequin to demonstrate the various points of injury. The trial court permitted the photographs of Erica Hurd into evidence, finding that "[g]ruesome pictures are admissible in these situations if it would tend to show some of these factors that are involved in the heinous, atrocious or cruel category, torture, physical abuse."

Although we concede that the photographs are not pleasant to view, they accurately depict the nature and the extent of the victim's injuries. There is no dispute that the photographs were introduced to prove the aggravating circumstance of "heinous, atrocious, or cruel." This evidence was relevant to support the State's proof of the "heinous, atrocious, and cruel"

---

3. The State also sought to introduce photographs of Charles Ragland. The trial court refused to admit these photographs into evidence. The State later voluntary withdrew these photographs.

aggravating circumstance. *See, e.g., State v. Hall*, 976 S.W.2d 121, 162 (Tenn.1998); *State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994), *cert. denied*, 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995); *State v. Smith*, 868 S.W.2d 561, 579 (Tenn.1993), *cert. denied*, 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994) (citing *State v. Payne*, 791 S.W.2d 10, 19–20 (Tenn.1990), *judgment aff'd. by*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Miller*, 771 S.W.2d 401, 403–404 (Tenn. 1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3292, 111 L.Ed.2d 801 (1990); *State v. Porterfield*, 746 S.W.2d 441, 449–450 (Tenn.), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); *State v. McNish*, 727 S.W.2d 490, 494–495 (Tenn.), *cert. denied*, 484 U.S. 873, 108 S.Ct. 210, 98 L.Ed.2d 161 (1987)).

Notwithstanding, as a general rule, where medical testimony adequately describes the degree or extent of the injury, gruesome and graphic photographs should not be admitted. *See State v. Duncan*, 698 S.W.2d 63 (Tenn.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986). The photographs were used by the physician who performed the autopsy to assist in explaining his testimony about the manner and cause of death. The photographs clarify the complex testimony of Dr. Smith regarding the severity of the injuries. *See Stephenson*, 878 S.W.2d at 542; *Smith*, 868 S.W.2d at 576 (photographs used to illustrate witnesses' testimony admissible for this purpose). Moreover, a relevant photograph is not rendered inadmissible merely because it is cumulative. *See State v. Bigbee*, 885 S.W.2d 797, 807 (Tenn.1994); *Van Tran*, 864 S.W.2d at 477.

We conclude that the photographs were not especially gruesome or shocking in na-ture so as to preclude their admission. Although any such photographs would be prejudicial to the appellant's case, the photographs introduced at the sentencing hearing were highly probative in determining an aggravating circumstance. We cannot conclude that the trial court abused its discretion by admitting these photographs during the sentencing process. *See* Tenn. R. Evid. 403; *State v. Evans*, 838 S.W.2d 185 (Tenn.1992); *Banks*, 564 S.W.2d at 947. *See also State v. Brown*, 756 S.W.2d 700, 704 (Tenn.Crim.App.1988); *Freshwater v. State*, 2 Tenn.Crim.App. 314, 453 S.W.2d 446, 451–52 (1969); *State v. Beckham*, No. 02C01–9406–CR–00107, 1995 WL 568471 (Tenn.Crim.App. at Jackson, Sept. 27, 1995 ), *perm. to appeal granted*, (Tenn. July 8, 1996), *perm. to appeal denied*, (Tenn. Sept. 9, 1996). This issue is without merit.

## VI. Victim Impact Evidence

During closing argument during the penalty phase, General Woodall made the following statements:

It's up. We know for sure that Erica is now gone, at peace and out of pain. There's a lot of other pain here and that's the families of these victims. That's what Angela Ragland went through and will have to go through and there are just not any mitigating circumstances that outweigh these aggravating circumstances, absolutely none. That's why we have this law and where the aggravating circumstances do not (sic) outweigh the mitigating circumstances, the punishment shall be death.

The appellant objects to this argument; contending that this statement constitutes victim impact evidence which is inadmissible, irrelevant to any aggravating or mitigating circumstance, and constitutes argument of matters not in evidence.[4]

---

**4.** As correctly noted by the State and conceded by the appellant, the appellant failed to make a contemporaneous objection to the prosecutor's statements resulting in waiver of this issue. Tenn. R.Crim. P. 52(a); *see State v. Renner*, 912 S.W.2d 701, 705 (Tenn.1995);

*Teague v. State*, 772 S.W.2d 915, 926 (Tenn. Crim.App.1988), *cert. denied*, 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn.Crim. App.1988). Due to the qualitative differences between death and other sentences, the appel-

Additionally, he asserts that the inflammatory argument posed a substantial risk that the death penalty was imposed arbitrarily, jeopardizing the reliability requirements of the Eighth Amendment.

The issues raised by the appellant herein were recently addressed in detail by our supreme court in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. at Jackson, 1998) *(for publication* ). In a thorough review of the case law development of the admissibility of victim impact evidence, the supreme court reached several conclusions on the issue.

First, noting prior decisions of the United States Supreme Court and its own precedent, the court held that "victim impact evidence and argument is [not] barred by the federal and state constitutions." *Nesbit. See also Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597,2609, 115 L.Ed.2d 720 (1991) (holding that the Eight Amendment erects no *per se* bar against the admission of victim impact evidence and prosecutorial argument); *State v. Shepherd*, 902 S.W.2d 895, 907 (Tenn.1995) (holding that victim impact evidence and prosecutorial argument is not precluded by the Tennessee Constitution); *State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn.), *cert. denied*, 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994) (same). Thus, the appellant's argument challenging the constitutionality of the admissibility of victim impact evidence and argument under the Eighth Amendment has been precluded by the Tennessee Supreme Court.

Additionally, the court addressed the relevancy of argument and evidence regarding the impact of the crime(s) on the victim's family. The court noted that, al-

though "[Tenn.Code Ann. § 39–13–204(c) ] . . . permits admission of all relevant mitigating evidence, whether or not the category of mitigation is listed in the statutory scheme," [5] "this Court repeatedly has held that the State may not rely upon nonstatutory aggravating circumstances to support imposition of the death penalty." *Nesbit* (citing *State v. Thompson*, 768 S.W.2d 239, 251 (Tenn.1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990); *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn.1979)). Notwithstanding, the court stated that, "in several subsequent decisions we have expressly recognized that a sentencing jury must be permitted to hear evidence about the *nature and circumstances of the crime* even though the proof is not necessarily related to a statutory aggravating circumstance." *Nesbit* (citing *State v. Harris*, 919 S.W.2d 323, 331 (Tenn.1996); *State v. Teague*, 897 S.W.2d 248, 251 (Tenn.1995); *Bigbee*, 885 S.W.2d at 813; *State v. Nichols*, 877 S.W.2d 722, 731 (Tenn.1994), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995)). (Emphasis in original). Accordingly, the court concluded that "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime." Id.* (emphasis in original).

In so holding, the court reasoned:

The Tennessee statute delineates .a procedure which enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. The statute allows the sentencing jury to be reminded 'that

---

late courts of this state consider issues occurring during the sentencing hearing in a capital case. *See Bigbee*, 885 S.W.2d at 805; *Duncan*, 698 S.W.2d at 67–68; *State v. Strouth*, 620 S.W.2d 467, 471 (Tenn.1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982). Thus, notwithstanding waiver of this claim, this court elects to consider this issue on the merits.

5. *See Nesbit* (citing *Cazes*, 875 S.W.2d at 266 (discussing *McKoy v. North Carolina*, 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) and *Mills v. Maryland*, 486 U.S. 367, 375, 108 S.Ct. 1860, 1865–66, 100 L.Ed.2d 384 (1988))).

just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608 (internal citations and quotations omitted). As this Court emphasized in its decision in *Payne,* it would be 'an affront to the civilized members of the human race' to allow unlimited mitigation proof at sentencing in a capital case, but completely preclude proof of the specific harm resulting from the homicide. Accordingly, the defendant's claim that victim impact evidence is not admissible under the Tennessee capital sentencing statute is without merit.

*Nesbit.*

The supreme court, however, limited this ruling, by holding that "victim impact evidence may [not] be introduced 'that is so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment." *Id.* (citing *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608). Moreover, the trial court, in its discretion, "may exclude victim impact proof if its probative value is substantially outweighed by its prejudicial effect." *Id.* (citing Tenn. R. Evid. 403). Indeed, "victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Id.* (internal citations omitted) (citing *Payne,* 501 U.S. at 822, 111 S.Ct. at 2607; *Payne,* 501 U.S. at 830, 111 S.Ct. at 2611 (O'Connor, J.,

concurring); *Cargle v. State,* 909 P.2d 806, 826 (Ok.Ct.Crim.App.1995)). Similarly, the court "cautioned the State against engaging in victim impact argument which is little more than an appeal to the emotions of the jurors as such argument may be unduly prejudicial." *Id.* (citing *Shepherd,* 902 S.W.2d at 907 (parenthetical omitted); *Bigbee,* 885 S.W.2d at 808 (parenthetical omitted)).

In the present case, the victim impact argument, in essence, is limited to "[t]hat's what Angela Ragland went through and will have to go through." It would be farfetched to conclude that this statement prejudiced the outcome of the sentencing phase as the effects of the double homicide on Angela Ragland were directly fashioned by the appellant and were clearly foreseeable. *See Payne v. Tennessee,* 501 U.S. at 838, 111 S.Ct. at 2615–2616 (Souter, J., concurring). Indeed, the fact that the death of a loved one is devasting requires no proof. Accordingly, the challenged argument was properly admitted.[6] This issue is without merit.

## VII. Separate Jury for Penalty Phase

The appellant claims that a separate jury should have been impaneled for the penalty phase of his trial. He asserts that, by requiring the same jury to hear both the guilt and penalty phases of his capital trial, he was deprived of his right to a fair and impartial jury under the Tennessee and United States Constitutions. Specifically, he contends that "he was denied a cross-section of the community because those jurors that could not enforce the death penalty were removed and he got a jury that was prone to give the death penalty."

This argument has been previously considered and rejected by our supreme court. In *State v. Harbison,* 704 S.W.2d 314, 318–319 (Tenn.1986), *cert. denied,* 476

---

**6.** Although not applicable to the present case as the murders occurred prior to the supreme court's decision in *Nesbit,* we note that the supreme court established procedures under which victim impact evidence may be introduced during capital sentencing phases. *See Nesbit.*

U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986), the court rejected a claim by the defendant that separate juries should have been sworn to hear the guilt and sentencing phases of the trial and held that a single jury in a capital case neither denied a fair cross section of the community nor resulted in a conviction prone process. *See also State v. Teel,* 793 S.W.2d 236, 246 (Tenn.), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990) (guilt prone jury argument "has been rejected by both the Tennessee and United States Supreme Courts"); *State v. Jones,* 789 S.W.2d 545, 547 (Tenn.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 280, 112 L.Ed.2d 234 (1990) (rejecting guilt prone jury claim); *State v. Zagorski,* 701 S.W.2d 808, 814–15 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986) (rejecting cross section claim);. This issue is without merit.[7]

### VIII. Constitutional Challenges

Finally, the appellant raises a myriad of challenges to the constitutionality of Tennessee's death penalty provisions. The appellant concedes that these issues have been previously rejected by the Tennessee Supreme Court, however, he raises these challenges to preserve them for future appellate review.

### A. Death by Electrocution

The appellant first contends that "[t]he electric chair constitutes cruel and unusual punishment," emphasizing that "the Eighth Amendment forbids inhuman and barbarous methods of execution that go beyond the mere extinguishment of life and cause torture or a lingering death." (citing *Glass v. Louisiana,* 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985)). As support for his argument, the appellant refers to recent legislation in this state moving beyond death by electrocution and substituting lethal injection. *See* Tenn. Code Ann. § 40–23–114 (1998 Supp.) (changes the method of execution from electrocution to lethal injection for those persons sentenced to death after January 1, 1999).[8] We do not see how this amendment renders death by electrocution unconstitutional. The appellate courts of this state are of the opinion that electrocution is a constitutionally permissible method of execution and have routinely rejected this argument. *See Black,* 815 S.W.2d at 179; *see also Hines,* 919 S.W.2d at 582.

### B. Death penalty is cruel and unusual punishment.

Within this challenge, the appellant makes numerous challenges alleging that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 8, 9, 16, and, 17, and Article II, Section 2 of the Tennessee Constitution. These arguments have previously been rejected by our supreme court:

1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically because Tenn.Code Ann. § 39–13–204(i)(4), (5), (6), and (7) encompass a majority of the homicides committed in Tennessee,[9] have been

---

7. Additionally, we note that Tennessee's statutory scheme for first degree murder mandates that the "same jury that determined guilt" "shall fix the punishment in a separate sentencing hearing." *See* Tenn.Code Ann. § 39–13–204(a) (1994 Supp.).

8. The bill also provides that those persons sentenced to death prior to January 1, 1999, may choose to be executed by lethal injection by signing a written waiver. *See* Constitutionality of House Bill 2085 as amended—Change in Method of Execution, Tenn. Op. Atty. Gen. No. 98–074 (Mar. 31, 1998); Constitutionality of House Bill 2085—Change in Method of Execution, Tenn. Op. Atty. Gen. No. 98–068 (Mar. 25, 1998).

9. We note that factors (i)(4) and (i)(6) do not pertain to this case as they were not relied upon by the State. Thus, any individual claim with respect to these factors is without merit. *See, e.g., Hall,* 958 S.W.2d at 715; *Brimmer,* 876 S.W.2d at 87.

rejected by our supreme court. *See State v. Keen,* 926 S.W.2d 727, 742 (Tenn.1994).

2. The death sentence is imposed capriciously and arbitrarily in that:

(1) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected. *See Hines,* 919 S.W.2d at 582.

(2) The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender. This argument has been rejected. *See Hines,* 919 S.W.2d at 582; *Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *State v. Smith,* 857 S.W.2d 1, 23 (Tenn.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993).

(3) There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected. *See State v. Caughron,* 855 S.W.2d 526, 542 (Tenn.), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993).

(4) The death qualification process skews the make-up of the jury and results in a relatively prosecution prone guilt-prone jury. This argument has been rejected. *See Teel,* 793 S.W.2d at 246; *Harbison,* 704 S.W.2d at 318.

(5) Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, *i.e.,* the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 86–87; *Cazes,* 875 S.W.2d at 268; *Black,* 815 S.W.2d at 179.

(6) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87;

*Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 22–23.

(7) Requiring the jury to agree unanimously to a life verdict violates *Mills v. Maryland* and *McKoy v. North Carolina.* This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Thompson,* 768 S.W.2d at 250; *State v. King,* 718 S.W.2d 241, 249 (Tenn.1986), *superseded by statute as recognized by, State v. Hutchison,* 898 S.W.2d 161 (Tenn.1994).

(8) The jury is not required to make the ultimate determination that death is the appropriate penalty. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Smith,* 857 S.W.2d at 22.

(9) The defendant is denied final closing argument in the penalty phase of the trial. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 269; *Smith,* 857 S.W.2d at 24; *Caughron,* 855 S.W.2d at 542.

3. Appellate Review process in death penalty cases is constitutionally inadequate.

The defendant argues that the appellate review process in death penalty cases is constitutionally inadequate in its application. He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed. This argument has been specifically rejected by our supreme court on numerous occasions. *See Cazes,* 875 S.W.2d at 270–71; *see also Harris,* 839 S.W.2d at 77; *Barber,* 753 S.W.2d at 664. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *Bland,* 958 S.W.2d at 663.

**(Deleted: IX. Proportionality Review)**

### Conclusion

In accordance with the mandate of Tenn.Code Ann. § 39–13–206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–206(c)(1)(A)-(C). A comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Likewise, we have considered the appellant's assignments of error as to each of his convictions on appeal and the respective sentences and determined that none have merit. Additionally, we conclude, in reference to the murder of Charles Ragland, that the jury appropriately found two statutory aggravating circumstances and did not arbitrarily impose a sentence of life without the possibility of parole as to that count. Thus, we affirm the appellant's conviction for the first degree murder of Charles Ragland and the accompanying sentence of life without the possibility of parole, his conviction for the first degree murder of Erica Hurd and the accompanying sentence of death by electrocution, and his conviction for the aggravated rape of Angela Ragland and the accompanying sentence of twenty-five years.[10]

CONCUR:

---

**10.** No execution date is set. Tenn.Code Ann. § 39–13–206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the death sentence is upheld by the higher court on review, the supreme court will set the execution date.

JOE G. RILEY, Judge

JOHN EVERETT WILLIAMS, Judge